IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ALLISON BONNET-PRITCHETT, | § | |
| *Individually and as dependent administrator of,* | § | |
| *and on behalf of, the Estate of Cameron James Pritchett* | § | |
| *and Cameron James Pritchett's heirs-at law*, and | § | |
| TONI FILLINGER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:21-CV-149-RP |
| | § | |
| WASHINGTON COUNTY, TEXAS, | § | |
| | § | |
| Defendant. | § | |

**ORDER**

Before the Court is Defendant Washington County, Texas's ("Washington County") Motion for Summary Judgment. (Dkt. 83). Plaintiffs Allison Bonnet-Pritchett and Toni Fillinger (together, "Plaintiffs") filed a response, (Dkt. 85), Washington County filed a reply, (Dkt. 87), and Plaintiffs filed a surreply, (Dkt. 90). Having considered the parties' submissions, the record, and the applicable law, the Court will grant in part and deny in part the motion.

**I. BACKGROUND**

This case arises out of the death of Cameron Pritchett ("Cameron") while in Washington County Jail. Cameron was arrested and detained on March 3, 2019, and committed suicide three days later, using a self-made ligature to hang himself inside his cell. (Am. Compl., Dkt. 75, at 18).

Cameron was first arrested and sent to Washington County Jail in July 2018. (Am. Compl., Dkt. 75, at 8). During his booking, Cameron reported several mental health concerns on his intake form. (*Id.* at 9). Specifically, Cameron stated that he had previously suffered from a traumatic brain injury or loss of consciousness, that he had nightmares, flashbacks, or repeated thoughts related to

PTSD, and was extremely worried that he would lose his job. (*Id.*). Cameron appears to have been discharged from the prison shortly after his intake. (*Id.*).

In November 2018, Cameron was once again arrested and incarcerated, this time in Williamson County Jail. The jail's intake form noted that he was using or receiving Olanzapine, an antipsychotic drug used to treat severe mood disorders. (*Id.* at 12). The jail also noted that he had other mental illnesses, including bipolar disorder, anxiety, and PTSD. (*Id.*). Williamson County officers transferred Cameron to Washington County, and jailers at the Washington County Jail copied his intake form. They likewise noted that he used Olanzapine and had PTSD, bipolar disorder, and anxiety. (*Id.* at 14). Washington County also completed a suicide screening form, which stated that Cameron believed others could control his mind, that he had nightmares, was worried he would lose his job, and believed someone else might harm or kill him. (*Id.* at 16). The screening form did not note that Cameron took Olanzapine, despite having listed it on the intake form. (*Id.*).

Once again, Cameron was released. He was arrested for the third and final time on March 3, 2019, when he was booked into Washington County Jail. Upon booking, jail staff conducted another medical and mental health screening of Cameron. (Mot. Summ. J., Dkt. 56, at 4). This time, however, Cameron denied having suicidal thoughts, depression, self-harm issues, and stated that he had never received care for his mental health. (2019 Intake Form, Dkt. 85-4, at 13). Still, the screening noted that he suffered nightmares, was worried someone might kill or hurt him, and was extremely worried he would lose his job, spouse, or children. (*Id.*). The form also noted that Cameron was not a possible match for the continuity of care query system. (*Id.*).

Plaintiffs claim that this form, combined with those from Cameron's prior arrests, should have put Washington County on notice that he had suicidal tendencies. (Am. Compl., Dkt. 75, at 17–18). However, Washington County did not note that Cameron was at risk for suicide and maintains that he "gave no outward signs of any suicidal condition that could objectively be

considered by any reasonable jail staff to be a suicide risk." (Mot. Summ. J., Dkt. 83, at 11).[1]

Plaintiffs argue that the failure to note any suicidal tendencies stems from Washington County's

failure to review past medical records or records from other jails. (Pl.'s Resp., Dkt. 85, at 10–21).

They contend that, had Washington County properly reviewed inmate mental health history, the jail

would have been on notice of his suicidal tendencies. (*Id*.).

On the day of his death, Plaintiffs allege that Cameron did not get up for meals and instead

spent the entire day sleeping. (Am. Compl., Dkt. 75, at 27).[2] Jailer Jacob Faske ("Faske") conducted

hourly cell checks that day. (*Id*. at 21). Around 1:35 p.m., he noticed Cameron with his blanket

blocking the view of his cell such that "Faske could only see [his] feet beneath the blanket." (*Id*.). At

2:25 p.m., Faske conducted another round of cell checks. (*Id*. at 22). Plaintiffs allege that he again

noted the blanket in Cameron's cell. (*Id*.). He told Cameron to take the blanket down "so that [he

could] have visual access to the inside of his cell." (*Id*.). Hearing no response, he called for help. (*Id*.).

Officer Shannon May ("May") and another officer arrived and accompanied Faske to Cameron's

cell, where they "found Cameron dead with a sheet tied around his neck and fastened to the

handhold by his bunk." (*Id*.).

Plaintiffs allege several failures that allowed Cameron to commit suicide while in Washington

County Jail, beyond just the failure to share and review medical information. Perhaps most critically,

Plaintiffs allege that Washington County allowed jailers to hang blankets over their cells to prevent

jail staff from viewing inside. (Pl.'s Resp., Dkt. 85, at 10-13). Plaintiffs state that Cameron

"committed suicide at a time when he was allowed, by Washington County, policy, practice, and/or

custom, to block jailer's view of him with a blanket." (Am. Compl., Dkt. 75, at 22). Relatedly,

---

[1] As a result, jail staff placed only conducted hourly screenings for Cameron, instead of twice-hourly screenings for inmates deemed to be at risk of suicide. (Pl.'s Resp., Dkt. 85, at 7).
[2] Plaintiffs argue that this lethargic behavior should have made Washington County aware of the risk of suicide (Am. Compl., Dkt. 75, at 21).

Plaintiffs argue that jail staff failed to properly monitor inmates via face-to-face observation because they allowed jail cell coverings. (Pl.'s Resp., Dkt. 85, at 13). Plaintiffs also argue that inmates were isolated in their cells, which contributed to any mental health problems they might have. (Am. Compl., Dkt. 75, at 23). Finally, they allege that Washington County failed to properly train its jailers and that it consistently understaffed medical personnel. (*Id.* at 44–47). As a result, Cameron was able to hide his self-made ligature from view, which he ultimately used to commit suicide. (Am. Compl., Dkt. 75, at 22).

Based on these allegations, Plaintiffs asserted causes of action for violations of the Fourteenth Amendment against Washington County and Faske, May, and Jail Administrator Eric Hensley ("Hensley") under 42 U.S.C. § 1983. (Compl., Dkt. 1, at 63–69). All named Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). (Mot. Dismiss, Dkt. 8). On March 31, 2022, the Court granted the motion in part and denied it in part. (Order, Dkt. 32). The Court found that, based on Fifth Circuit precedent, Plaintiffs had not established any actual awareness of Cameron's suicidal tendencies. (*Id.*). While Cameron may have shown signs that could indicate suicidal behavior, it did not rise to the level needed to show deliberate indifference on the part of jail officials. Accordingly, the Court dismissed the claims as to the individual officials, Faske, May, and Hensley. (*Id.*). However, the Court found that Plaintiffs had stated a plausible claim as to Washington County. It found that cell coverings, the failure to train, and deficient customs or policies may have contributed to Cameron's death in a way that violated his constitutional rights. (*Id.* at 13). The Court allowed Plaintiffs' claim to proceed against Washington County.

On July 8, 2022, Washington County filed a motion for summary judgment on all remaining claims. (Mot. Summ. J., Dkt. 56). It argued that Plaintiffs could no longer plead a viable episodic act or omission claim under § 1983 because the individual defendants had already been dismissed, and therefore, Plaintiffs could not show anyone who acted with deliberate indifference. (*Id.* at 9). The

Court agreed, noting that the failure to identify an individual who violated Cameron's constitutional rights meant that liability could not pass through to Washington County. (Order, Dkt. 68). The Court noted that Plaintiffs could potentially plead a viable conditions of confinement claim, but that such a claim had not been adequately pled or briefed. (*Id.*). As a result, the Court granted summary judgment for Washington County.

Plaintiffs then moved to alter or amend the judgment, arguing that they did plead a conditions of confinement claim and should be allowed to amend their complaint. (Mot., Dkt. 71). The Court agreed and allowed Plaintiffs to file an amended complaint. (Order, Dkt. 74; Am. Compl., Dkt. 75). Washington County then filed the instant, renewed motion for summary judgment. (Mot. Summ. J., Dkt. 83).

Washington County first argues that the conditions of confinement claim fails because it implicates the same liability as an acts or omissions claim, which this Court already dismissed. (*Id.* at 6–8). Next, it argues that there is no pattern or history of inmate suicides at Washington County Jail, that the policies met minimum safety standards, that it had no obligation to constantly monitor jail cells, and never allowed jail cell coverings as a matter of policy. (*Id.* at 8–11). Washington County also contends that the failure to train claim cannot pass muster because it was not deliberately indifferent in training its staff, and that the individual employees acted as trained and certified jailers. (*Id.* at 11–14). Finally, Washington County argues that the specific policies, including use of single-occupancy cells and information sharing cannot support liability against the County. (*Id.* at 14–19).

Plaintiffs' response contends that their complaint tracks language of a conditions of confinement claim, and that they have met the requisite elements. (Pls.' Resp., Dkt. 85, at 6–10). They argue that Washington County allowed inmates to hang blankets to cover their cells doors as a matter of practice. (*Id.*). They further argue that Washington County should have known it was a risk to jail Cameron in his own cell, and that they should have shared mental health information from

prior incarcerations. (*Id.* at 13–16). Finally, Plaintiffs contend that the jail was perpetually understaffed and that jailers were undertrained in detecting suicidal tendencies and providing mental health care. (*Id.* at 20–24).

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to

"sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000).

### III. DISCUSSION

#### A. Allegations of Unconstitutional Conditions

"To state a claim under § 1983, a plaintiff must allege facts showing that a person, acting under color of state law, deprived the plaintiff of a right, privilege or immunity secured by the United States Constitution or the laws of the United States." *Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 686 (5th Cir. 2010). To state a conditions of confinement claim, a plaintiff must show:

> (1) a rule or restriction or . . . the existence of an identifiable intended condition or practice . . . [or] that the jail official's acts or omissions were sufficiently extended or pervasive; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of [a detainee's] constitutional rights.

*Estate of Bonilla by & through Bonilla v. Orange Cnty., Texas*, 982 F.3d 298, 308–09 (5th Cir. 2020) (internal quotations omitted).

The proper inquiry for conditions of confinement claims "is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). To make this showing, a plaintiff can present evidence of (1) "practices that are sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct"; (2) "consistent testimony of jail employees"; (3) Texas Commission on Jail Standards ("TCJS") reports; (4) failures to reprimand; or (5) a "mutually enforcing effect" of multiple interacting policies. *Sanchez v. Young Cnty., Tex.*, 956 F.3d 785, 792–96 (5th Cir. 2020) ("*Sanchez II*").

Here, Plaintiffs point to several conditions that led to Cameron's death. (Pls.' Resp., Dkt. 85, at 10). Namely, Plaintiffs contend that inmates were allowed to hang blankets to obstruct views into

their cells, (*id.* at 10–13), that jailers failed to monitor the inmates, (*id.* at 14–16), that medical health information from prior incarcerations was not shared, (*id.* at 16–17), that detainees were isolated in their own cells, (*id.* at 17–18), and that Washington County understaffed medical care, (*id.* at 18–19).

1. Hanging Blankets in Cells

a. Existence of a Policy or Practice

The Court first addresses Plaintiffs' allegation that Washington County maintained a practice of allowing inmates to hang blankets across their cell bars to prevent staff from looking inside. (*Id.* at 10–13). They claim that this custom led to the unconstitutional deprivation of medical care for Cameron and ultimately caused his death. (*Id.*). Washington County does not dispute that Cameron blocked views into his cell using a blanket but argues that inmates' use of cell coverings was not a municipal "policy or practice." (Def.'s Reply, Dkt. 87, at 6). Washington County contends that, regardless of whether inmates did hang blankets over their cells, there is no evidence that Washington County allowed those blanket coverings as an official policy or practice. (Mot. Summ. J., Dkt. 83, at 15).

Here, the evidence is sufficiently mixed to create a genuine dispute of material fact. Several Washington County officials, including Jail Administrator Hensley and Officers Faske, May, Eric Shows, and Justin Bosse, all testified (after Cameron's death) that prisoners were not allowed to hang blankets in their cells. (*Id.* at 15 (citing deposition transcripts)). Other evidence, however, tends to contradict their testimony. Faske testified that, when he conducted his first observation round of Cameron's cell, he told him to take the blanket down by the next round—approximately 50 minutes later. (Faske Dep., Dkt. 83-1, at 235–36). Faske also stated in his initial jail incidence report, "It is a common practice to put up a blanket for privacy when inmates are using the toilet." (Faske Report, Dkt. 85-8, at 66).

Similarly, while Hensley testified that blankets would not be allowed, his reports to TCJS after Cameron's death appear inconsistent on the matter. At first, Hensley noted in his report to TCJS that Faske told Cameron to remove the blanket from the bars. (Hensley Report #1, Dkt. 85-1, at 117). However, Hensley omitted this from his later report, omitting the potion that stated, "Fakse instructed inmate Pritchett to remove the blanket from the bars or it would be taken from him." (*Compare id. with* Hensley Report #2, Dkt. 85-1, at 118). When asked why he adjusted his report, Hensley stated, "When TCJS sent me an e-mail stating that my report didn't reflect what actually happened from Faske, and that's when I read Faske's report, and I had to adjust my report because I'm not going to have one of my guys adjust anything when it comes to an investigation because that just looks shady." (Hensley Dep., Dkt. 85-1, at 105–06). Although a juror may credit Hensley's explanation, it is also reasonable for a juror to infer that Hensley removed this portion because it tended to reflect Washington County's actual practice of allowing cell coverings. Even if that inference is unlikely, the corresponding credibility determination is "the purest of jury issues." *Sanchez II*, 956 F.3d at 794 (quoting *Hindman v. City of Paris*, 746 F.2d 1063, 1068 (5th Cir. 1984)).

Beyond the TCJS report, Hensley testified that inmates would "usually" cover their cell doors for privacy to use the bathroom as a "common practice." (Hensley Dep., Dkt. 85-8, at 95–96, 102). In a video at Cameron's cell shortly after his death, Hensley told Faske that his blanket was "going higher than I'd like though." (Scene Video, Dkt. 85). The statement implies that—at least to some degree or height—blankets did commonly cover cell doors. Moreover, Officer Alexander Aguado, stated that hanging blankets is "what people usually do." (Aguado Video, Dkt. 85). After Cameron's death, Hensley told TCJS, "Since this incident I have instructed staff that tying blankets or sheets to cells for privacy shall not be allowed and will not be tolerated." (Hensley Report, Dkt. 85-1, at 117).

9

The testimony from the videos as well as the change in Hensley's report create a material dispute of fact regarding the actual practice that Washington County maintained regarding cell coverings at its jail. A reasonable jury could find that the jail either had a practice of allowing blankets to cover the cell doors or a practice of allowing inmates to cover their cell doors until they were told repeatedly to take them down.

In their reply, Washington County appears to suggest that because "[o]fficers were trained to instruct inmates to remove blankets whenever they spotted them," the jail did not maintain an official policy or practice of allowing cell coverings. (Def.'s Reply, Dkt. 87, at 6). However, even accepting that Washington County never officially promulgated a written policy of allowing cell coverings, there is evidence that such a custom still existed. A custom may support § 1983 liability if it is a "persistent, widespread practice of [municipal] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)).

The inquiry is whether the custom of allowing cell coverings was "so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "If a municipality condones an unlawful custom, it cannot avoid liability by claiming that it did not authorize its agents in writing to break the law in the course of their duties." *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 509 (5th Cir. 2022). Statements from Washington County's own employees that cell coverings were "usual" and "what people usually do"—combined with the change in practice made *after* Cameron's death—support the existence of a persistent, widespread practice. Accordingly, the Court finds that there is a genuine dispute about the existence of a custom or practice allowing cell coverings.

b. Whether the Practice was Unconstitutional

Having established a question of fact as to an official practice or custom, the remaining conditions of confinement inquiries are whether the cell coverings were related to a legitimate governmental objective and whether the practice caused the violation of Cameron's constitutional rights. *Bonilla*, 982 F.3d at 308–09. As to a governmental objective, Washington County fails to note any legitimate objective in allowing cell coverings, and the Court is aware of none. As to the deprivation of a right, the Fifth Circuit has repeatedly recognized that there is a constitutional right to medical care while in jail. *Flores v. Cnty. of Hardeman, Tex.*, 124 F.3d 736 (5th Cir. 1997); *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644 (5th Cir. 1996) (en banc); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994) ("[P]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care . . . ."). This encompasses the right to adequate protection from suicidal tendencies. *Flores*, 124 F.3d at 738. The use of cell coverings arguably caused Cameron to be deprived of protection from his suicidal tendencies because it rendered jail staff (and other inmates) unable to see him in his cell, view the self-made ligature before Cameron's death, or respond in time to his suicide.[3] As a result, Cameron has demonstrated a question of fact on all three elements of a conditions of confinement claim as related to the use of cell coverings.

2. Failure to Monitor

Next, the Court turns to Plaintiffs' allegations that Washington County failed to monitor inmates in their cells. Plaintiffs allege that the monitoring was insufficient because they failed to make face-to-face contact with detainees. (Pls.' Resp., Dkt. 85, at 14). Video footage of Officer Faske's visit to Cameron's cell shows that he did not bend over to see Cameron or have a conversation with him. (*Id.* at 15 n.9). TCJS determined that Faske and Cameron did not converse

---

[3] Washington County does not seriously contest the causation element. (*See* Mot. Summ. J., Dkt. 83, at 15). Their sole argument mentioning "causation" is related to placing inmates in isolated cells—not about cell coverings. (*Id.* at 16).

face-to-face. (TCJS Report, Dkt. 85-4, at 15). Washington County argues that it had no indication that Cameron was suicidal, and therefore did not need to conduct special screenings of Cameron. (Def.'s Reply, Dkt. 87, at 6–7).

Ultimately, the failure to make visual contact with inmates and have face-to-face conversations is intertwined with the policy of allowing cell coverings. Because TCJS determined that jail officials failed to conduct face-to-face conversations with Cameron, it is reasonable to believe that such a failure contributed to Cameron's death. It is also reasonable to believe that if Washington County allowed cell coverings, then it maintained a similar practice of not looking past cell coverings when conducting regular inspections.[4] As with cell coverings, the failure to monitor claim is sufficient to survive summary judgment.

### 3. Remaining Allegations of Unconstitutional Conditions

Beyond the cell coverings and failures to monitor, Plaintiffs allege several other unconstitutional conditions, including a failure to share and obtain medical health information from other jails, that detainees were isolated in cells, and that medical personnel were understaffed. Individually, it is not clear that these practices and policies amount to unconstitutional conditions of confinement. A plaintiff in conditions of confinement cases must show a "pervasive pattern of serious deficiencies in providing for his basic human needs." *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 454 (5th Cir. 2009). It is not clear that the failure to obtain prior medical information is a "pervasive pattern of serious deficiencies." *Id.* The same is likely true for understaffed medical personnel.

---

[4] The parties dispute whether jail officials should have checked on Cameron every 30 minutes—as opposed to once per hour. Because Cameron did not display "manifest" signs of suicidal tendencies, *see infra* Section III.D, the Court finds that the failure to conduct 30-minute checks alone was not an unconstitutional deprivation of medical care. Still, for the reasons noted in Section III.B, practices which are not unconstitutional conditions on their own may still prove relevant if they mutually reinforce the same deprivation. The other failures to monitor, while not necessarily unconstitutional alone, may still be relevant as reinforcing the alleged deprivation of Cameron's medical care.

Isolating prisoners in cells, while potentially amounting to punishment, can also relate to a "legitimate government objective." *Duvall v. Dallas Cnty.*, 631 F.3d 203, 207 (5th Cir. 2011).

While these policies are likely insufficient on their own to sustain a conditions of confinement claim, they all speak to the deprivation of Cameron's medical care. As the Supreme Court explained, "Some conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise . . . ." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (internal quotations omitted). Here, each practice alleged by Plaintiffs speaks to the same deprivation: the failure to provide medical care and screening to a suicidal inmate. The Fifth Circuit "do[es] not require a plaintiff to show that a 'policy or practice [was] the exclusive cause of the constitutional deprivation.'" *Sanchez II*, 956 F.3d at 795 (quoting *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 254 (5th Cir. 2018)). Instead, courts can "consider how individual policies or practices interact with one another within the larger system." *Stukenberg*, 907 F.3d at 255.

The Court has already determined that Washington County's practice of allowing cell blanket coverings was potentially an unconstitutional condition of confinement. *See infra* Section III.A.1. It follows that other policies which denied him protection from suicidal tendencies may be considered because they "have a mutually enforcing effect" of depriving him of medical care. *Wilson*, 501 U.S. at 304. Accordingly, although many of the alleged conditions may not be individually unconstitutional, the Court will decline to grant summary judgment in light of the potential finding that these policies mutually enforced the unconstitutional deprivation of a human need.

### B.  Propriety of a Conditions of Confinement Claim for Jail Suicide Cases

The Court next addresses whether Plaintiffs' jail suicide suit may be brought under a conditions of confinement claim as a more general manner. Washington County argues that alleging

13

conditions of confinement claims for suicides is like "an effort to fit a square peg into a round hole."

(Def.'s Reply, Dkt. 87, at 2 (quoting *Garza v. City of Donna*, 922 F.3d 626, 633–34 (5th Cir. 2019))).

Plaintiffs, meanwhile, argue that a conditions of confinement claim is appropriate here, where

multiple policies intersected to lead to Cameron's death.

In *Hare v. City of Corinth, Mississippi*, the en banc Fifth Circuit distinguished between

conditions of confinement claims and episodic acts or omissions claims for jail suicides. 74 F.3d at

644–45. As the circuit explained,

> For the *Bell* [conditions of confinement] test to apply, a jailer's act or
> omission must implement a rule or restriction or otherwise
> demonstrate the existence of an identifiable intended condition or
> practice. If a pretrial detainee is unable to point to such an established
> rule or restriction, then he must show that the jail official's acts or
> omissions were sufficiently extended or pervasive, or otherwise typical
> of extended or pervasive misconduct by other officials, to prove an
> intended condition or practice to which the [conditions of
> confinement] test can be meaningfully applied. Otherwise, in the
> absence of such a condition, practice, rule, or restriction, a jail official's
> act or omission can give rise to constitutional liability only if he was
> culpable, under an appropriate legal standard, with respect to the harm
> to the detainee.

*Id.* at 645.

Two more recent Fifth Circuit cases illustrate the difference. In 2019 in *Garza v. City of

Donna*, the Fifth Circuit dealt with a case where jail officials hung signs in the jail that mockingly

compared the jail to a prisoner of war camp. 922 F.3d at 633. The court held that these violations

did not amount to a conditions of confinement claim because they were "too nebulous to amount to

an official rule or restriction" and did not amount to a "continuing burden on inmate life in the way

that dangerously high temperatures or overcrowded cells do." *Id.* at 634. It stated that "theories in

which a particular actor is 'interposed' between the injured party and the municipal defendant are

properly treated as episodic-act cases." *Id.* at 633. *Garza* affirmed, however, that the district court

had overstepped by holding that jail-suicide cases are "uniformly" decided on an episodic-act basis. *Id.* at 933 n.3.

Indeed, the *Garza* footnote cited a 2017 Fifth Circuit case holding that "plaintiffs can bring a pretrial detainee case, whether or not it ultimately involves suicide, under alternative theories of episodic acts and omissions by individual defendants or unconstitutional conditions of confinement." *Sanchez v. Young Cnty., Tex.*, 866 F.3d 274, 279 n.3 (5th Cir. 2017) ("*Sanchez I*"). In *Sanchez I*, the district court had dismissed the plaintiffs' § 1983 claim because it failed to identify an individual constitutional violation and therefore found that the plaintiffs could not prove a necessary element of their episodic act and omission claim. *Id.* at 279. The district court refused to consider whether plaintiffs could survive a conditions of confinement claim, and the Fifth Circuit remanded with instructions to consider the claims under conditions of confinement. *Id.* ("Because the district court focused only on the plaintiffs' claim that episodic acts and omissions of the jail personnel could be imputed to the County, it did not analyze their unconstitutional conditions of confinement claim at all."). Upon remand, the district court once again granted summary judgment to the county, holding that no facts suggested a conditions of confinement violation. *Sanchez II*, 956 F.3d at 790–91. The Fifth Circuit once again reversed and remanded. It held that plaintiffs had presented sufficient evidence of a pervasive practice of misconduct. *Id.* at 792–94. It noted that the interaction of mutually enforcing jail policies created a genuine dispute of fact as to whether the jail had unconstitutionally deprived the inmate of medical care. *Id.*

Given the Fifth Circuit's opinions in *Sanchez I* and *Sanchez II*, the Court is not convinced by Washington County's arguments that bringing a conditions of confinement claim for jail suicides is necessarily like "fitting a square peg into a round hole." (Def.'s Reply, Dkt. 87, at 2 (quoting *Garza*, 922 F.3d at 633–34)). Plaintiffs challenge a practice of denying suicide prevention to detainees that ultimately caused Cameron's death. Plaintiffs do not allege that a jail official was interposed between

15

Washington County and his death, but rather that the County's pervasive practices led to his suicide.[5] The challenge to systemic conditions properly falls under a conditions of confinement claim. *Shepherd*, 591 F.3d at, 453 (affirming characterization of case as conditions of confinement where the claim "does not implicate the acts or omissions of individuals but the jail's system of providing medical care to inmates"). The notion that unconstitutional conditions of confinement claims have "rarely been met in our caselaw" does not bar Plaintiffs' claims altogether. *Id.* at 452.

### C. Policymaker Identity

The parties also dispute whether Washington County delegated policymaking authority to the jail administrator.[6] "[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski*, 237 F.3d at 578. "Under Texas law, sheriffs are 'final policymakers' in the area of law enforcement for the purposes of holding a county liable under § 1983." *Roe v. Johnson Cnty.*, 21-10890, 2023 WL 117826, at *3 (5th Cir. Jan. 5, 2023) (quoting *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009)). Although Texas law conclusively establishes the policymaker's identity, a "municipal employee may also possess final policymaking authority where the final policymaker has delegated that authority, either expressly or impliedly." *Webb v. Town of Saint Joseph*, 925 F.3d 209, 215 (5th Cir. 2019). When examining if delegation has occurred, the Fifth Circuit distinguishes decision makers from policymakers, defining the latter as "act[ing] in the place of the governing body in the

---

[5] It is worth noting that, in the previous summary judgment motion, Washington County took the position that *Monell* liability could not attach because even if Washington County did violate Cameron's constitutional rights, no municipal employee was interposed in that action. (Mot. Summ. J., Dkt. 56, at 9–10; Order, Dkt. 68). Having taken this position, Washington County cannot now claim that conditions of confinement is an invalid claim because a municipal employee *was* interposed between Cameron and the County.

[6] Although Washington County does not move for summary judgment on the failure to identify a policymaker, the County does raise the issue in its reply brief. (Mot. Summ. J., Dkt. 83; Def.'s Reply, Dkt. 87, at 2).

area of their responsibility; they are not supervised except as to the totality of their performance."
*Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984) (en banc).

Plaintiffs argue that Jail Administrator Eric Hensley ("Hensley") was delegated as the relevant policymaker for Washington County's jail. (Pl.'s Resp., Dkt. 85, at 8). They base this off an affidavit from Hensley, submitted on behalf of Washington County for summary judgment, that states, "As Jail Administrator, I am in charge of all operations at the Washington County Jail and I am responsible for ensuring that our activities at the jail conform to the minimum standards promulgated by [TCJS]." (Hensley Decl., Dkt. 83-1, at 3). Plaintiffs further argue that Hensley made the decision to isolate detainees in their cells and told Faske that Cameron's blanket was "going higher than I'd like" and, after his death, that "trying blankets or sheets to cells for privacy" would no longer be allowed. (Pl.'s Resp., Dkt. 85, at 8–9).

Washington County contests this characterization, arguing that it never delegated authority to Hensley. (Def.'s Reply, Dkt. 87, at 2–4). At the summary judgment stage, this argument is unavailing. Plaintiffs have set forth evidence that Hensley promulgated the relevant policies at the Washington County Jail. After Cameron's death, he instructed jail staff to remove blanket coverings from the cells. (May Dep., Dkt. 83-1, at 609). Hensley changed the jail's rule from confining inmates to a block to confining them in individual cells. (Hensley Dep., Dkt. 85-1, at 97–98). These examples are sufficient to create a material dispute about whether Hensley had been delegated policymaking responsibility. As to these two key practices—allowing blanket coverings and confining inmates to individual cells—Hensley appears to have controlled the relevant policy. Although the sheriff may have "supervised [him] . . . to the totality of [his] performance," Hensley was arguably "act[ing] in place of the" sheriff as policymaker at the jail. *Bennett*, 728 at 769.

Of course, "[d]iscretion to exercise a particular function does not necessarily entail final policymaking authority over that function." *Martinez v. City of N. Richland Hills*, 846 F. App'x 238,

246 (5th Cir. 2021) (per curiam). However, Hensley's authority appears to have exceeded simple

decision-making. Hensley was not, for example, deciding case-by-case whether blankets could be

allowed, or whether to confine inmates to their cells. Rather, Hensley appears to have created

general policies as to when inmates could be confined and whether blankets could be allowed as a

whole. There remains a genuine question of fact as to whether delegation occurred, and thus

whether Hensley was granted policymaking power. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737

(1989).[7]

### D. Failure to Train

Beyond the conditions of confinement claim, Washington County moves for summary

judgment on Plaintiffs' failure to train claim. (Mot. Summ. J., Dkt. 83, at 12–14). In its previous

summary judgment order, the Court noted that, unlike other episodic claims, Plaintiffs' failure to

train claim did not fail as a matter of law simply because no individual could be found to violate

Cameron's constitutional rights. (Order, Dkt. 68, at 9); *Carnaby v. City of Houston*, 636 F.3d 183, 189

(5th Cir. 2011) ("We have yet to address, directly, whether a municipality can ever be held liable for

failure to train its officers adequately where the officers did not commit any constitutional

violation."). Nonetheless, the Court dismissed the failure to train claims because Plaintiffs failed to

identify the relevant policymaker for *Monell* purposes. (Order, Dkt. 68, at 10). Plaintiffs re-pled the

claims in their amended complaint, naming the Sheriff as the presumed policymaker (and noting in

---

[7] It is not entirely clear that the question of delegation plays a critical role in Plaintiffs' claim. Because
Plaintiffs allege a pattern or practice, rather than an official policy, the intent to subject a detainee to
punishment is presumed by the presence of unconstitutional conditions of confinement. *See Duvall v. Dallas
Cnty., Tex.*, 631 F.3d 203, 207 (5th Cir. 2011) ("The County insists that [plaintiff's case] is not a traditional
"conditions of confinement" case because the County's policymaker, the Sheriff, did not promulgate a rule
that brought the bacteria into the Jail. This is correct . . . but the law is well settled that . . . its intent to do so
is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and
practices."); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (holding that, because the city
policymaker failed to change policies or to discipline or reprimand officials, the jury was entitled to conclude
that the complained-of practices were "accepted as the way things are done and have been done in" that city).

their response that policymaking may have been delegated to Hensley). (Am. Compl., Dkt. 75, at 64; Pl.'s Resp., Dkt. 85, at 8–9).

As the Fifth Circuit has previously ruled, failure to train claims are necessarily episodic. *Sanchez II*, 956 F.3d at 793; *Flores*, 124 F.3d at 738. Although municipalities must provide custodial officials with "minimal training to detect 'obvious medical needs of detainees with known, demonstrable, and serious medical disorders,'" a "failure to train custodial officials in screening procedures to detect latent suicidal tendencies does not rise to the level of a constitutional violation." *Evans v. City of Marlin*, 986 F.2d 104, 107–08 (5th Cir. 1993) (quoting *Burns v. City of Galveston*, 905 F.2d 100 (5th Cir. 1990)). Municipalities cannot be held liable unless there are "manifest signs" of suicidal tendencies. *Whitt v. Stephens Cnty.*, 529 F.3d 278, 284 (5th Cir. 2008).

At the pleading stage, this Court held that the individual jailers lacked awareness of Cameron's suicidal tendencies, and the evidence has not substantially changed from the allegations in Plaintiffs' pleading. (Order, Dkt. 32). Plaintiffs point out that Cameron "was asleep all day" before he committed suicide. (Video Tr., Dkt. 85-8, at 11). They also point out that Cameron noted on his intake form that he had PTSD, was worried about losing his job, and was told by his teachers that he had difficulty learning. (Intake Form, Dkt. 85-4, at 11). Finally, they show that Cameron had presented even more serious mental health concerns in prior intake forms that should have been shared known to Washington County. (Pl.'s Resp., Dkt. 85, at 17). As this Court previously ruled, while these warning signs should have warranted more careful monitoring, "they do not establish a substantial risk of suicide as distinct from generalized mental health concerns." (Order, Dkt. 32, at 10). Because these mental health concerns do not show "manifest signs" of suicidal tendencies, the Court will grant summary judgment for Washington County on the failure to train claim.

## IV. CONCLUSION

For these reasons, the Court **IT IS ORDERED** that Washington County's Motion for

Summary Judgment, (Dkt. 83), is **GRANTED IN PART** as to Plaintiffs' failure to train claims and

**DENIED IN PART** as to Plaintiffs' conditions of confinement claims.

**SIGNED** on December 4, 2023.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

20